**Roger POULNOT, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 91–CT–477.**

District of Columbia Court of Appeals.

Argued March 12, 1992.
Decided May 1, 1992.

---

Kenneth Shepherd, for appellant.

Mary L. Wilson, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellee.

Before SCHWELB and KING, Associate Judges, and GALLAGHER, Senior Judge.

SCHWELB, Associate Judge:

Roger Poulnot was found guilty at a bench trial of operating a motor vehicle under the influence of alcohol, in violation of D.C.Code § 40–716(b)(1) (1990). On appeal, he contends that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt. He also claims that the trial judge erroneously admitted into evidence the results of two "intoxilyzer" tests of his breath, which the police administered to him more than two and a half hours after he operated the vehicle; Poulnot claimed to have ingested additional alcohol during the intervening period. Finally, Poulnot complains that the trial judge improperly purported to take judicial notice of the rate at which an individual absorbs and metabolizes alcohol. We reject his first two contentions, agree with the third, but conclude that the error was harmless. Accordingly, we affirm.

I

At about 2:45 a.m. on August 26, 1990, Poulnot was involved in a serious traffic

accident in which the occupants of another automobile were seriously injured. His conviction was based on his dangerous and erratic driving immediately before the accident, his admitted consumption of some alcohol at dinner several hours earlier, evidence that he was under the influence of alcohol approximately an hour and a half after the accident, and intoxilyzer tests of his breath which showed the presence of a substantial amount of alcohol in his system about two and a half hours after the accident.

The principal witnesses for the prosecution were a motorist who observed Poulnot operating his Mercedes–Benz shortly before the collision and a police officer assigned to the Traffic Alcohol Enforcement Unit of the Metropolitan Police Department (MPD).[1] The motorist, Vaughn Farrow, related that in the minutes preceding the accident he was driving his '76 Toyota Corolla in an easterly direction on Constitution Avenue, N.E. He was travelling at about 25 miles per hour (the posted speed limit)[2] when the operator of the Mercedes, who turned out to be Poulnot, began to "tailgate" him and eventually overtook him. Poulnot sped to a traffic light but failed to stop until he was "halfway through" the intersection. At the next light, Poulnot stopped "three quarters of the way through the light," almost "breaking the plane of where the light stood." According to Farrow, Poulnot then went through a third light just as it turned red. At this point, Farrow stopped at the red light and lost sight of Poulnot's car, but soon thereafter he heard a loud crash. Upon arriving at the scene, he saw "the black Mercedes facing down Constitution Avenue and a red Escort lying with both wheels on the curb against a tree, with two women in the car who were unconscious or weren't moving at all." Poulnot was standing at the driver's side of the Escort, saying "Lady, please don't die!" Farrow called the police and an ambulance, and assistance arrived shortly thereafter.

At some time after 4 a.m., Officer Maurice Hall responded to a police radio transmission and drove to the scene of the collision. He encountered Officer David K. Parrish, who had been investigating the accident.[3] Poulnot was not on the scene when Officer Hall arrived, but Hall encountered him a short time later. The officer noticed that Poulnot's eyes were bloodshot and watery, that there was a strong odor of alcohol on Poulnot's breath, that his speech was slurred, and that his clothing was in disarray.

Officer Hall was experienced in matters relating to traffic and alcohol. He had made approximately 2,000 alcohol-related arrests in his twenty-five years on the force. Concluding that Poulnot might be under the influence of alcohol, the officer proceeded to administer a number of roadside sobriety tests, including the "horizontal gaze" test, the "heel to toe" test, and the "finger to nose" test. Poulnot's performance was unsatisfactory with respect to each of these tests. Hall testified that he was therefore satisfied that Poulnot was under the influence of intoxicating liquor at 4:20 a.m.

Officer Hall told Poulnot that he wanted to take him to the MPD's Traffic Division for breath testing. Poulnot expressed some hesitation about the proposed breath test. He related to the officer that he had consumed two beers with dinner at about 10 p.m., and that two strangers had given him something to drink[4] at the scene,

---

1. A third witness, who was standing on the street in the vicinity of the accident testified that he heard the collision and that Poulnot was the driver of a Mercedes–Benz automobile that struck a Ford Escort.

2. At another point in his testimony, Farrow said he was travelling at no more than 15 miles per hour, but this testimony apparently related to a slightly different time.

3. The prosecutor initially advised the court that Officer Parrish would be called as a witness. As a result, the judge permitted Officer Hall to testify as to what Parrish told him about the accident. In fact, Officer Parrish never testified, and the prosecution presented no police testimony regarding Poulnot's condition immediately after the accident.

4. Poulnot told Officer Hall that he did not know what the drink was, but it is apparent from the context of Hall's testimony that Poulnot was referring to an alcoholic beverage.

shortly after the accident, because he was nervous and crying.

Poulnot accompanied Hall to the Traffic Division. There, he voluntarily submitted to two separate "intoxilyzer"[5] tests at 5:20 a.m. and 5:29 a.m. In each case, the intoxilyzer revealed that his breath contained .09 percent of alcohol.

James Hill, who lives a few houses away from the scene of the accident, was the only defense witness. He heard a "loud boom," went outside to the scene of the accident. He testified that at approximately 3:30 or 3:45 a.m., he saw his roommate, Dennis Davis, with Poulnot. Shortly thereafter Davis brought Poulnot to the home Hill shared with Davis. Poulnot drank several beers (Hill testified that "it was more than one, I know") and then called a taxi. As Poulnot was about to enter the cab, the police intervened, told the driver that he could leave, and administered roadside sobriety tests to Poulnot.

After hearing the evidence, the judge found Poulnot guilty as charged. The judge stated that there was "no question in this court's mind [that Poulnot] was under the influence of intoxicating liquor." The judge found it "very strange" that Poulnot had told the police that he had consumed a drink in the crowd, "and then [left] out the fact that he had two beers at the house." The judge concluded:

> [T]here is no way on this earth that two beers could bring him to .09 when you consider the fact that he is losing .01 every 40 minutes. So that cannot happen, and he clearly had been drinking before the accident, and his conduct is consistent with a person who is under the influence, and we find he clearly was under the influence at the time of the accident. We find the defendant guilty as charged.

## II

In evaluating Poulnot's claim of evidentiary insufficiency, we view the evidence, both direct and circumstantial, in the light most favorable to the prosecution, giving full weight to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences. *See, e.g., Abdulshakur v. District of Columbia,* 589 A.2d 1258, 1263 (D.C.1991). We will reverse only when the proof is insufficient as a matter of law to persuade an impartial trier of fact of the defendant's guilt beyond a reasonable doubt. *Id.; see also Stevenson v. District of Columbia,* 562 A.2d 622, 624 (D.C.1989).

Poulnot was prosecuted pursuant to D.C.Code § 40–716(b)(1), which provides in pertinent part that "[n]o individual shall, when ... *under the influence of intoxicating liquor* ... operate ... any vehicle in the District." (Emphasis added). In *State v. Deming,* 66 N.M. 175, 180, 344 P.2d 481, 484–85 (1959) (quoting *State v. Sisneros,* 42 N.M. 500, 507, 82 P.2d 274, 278 (1938)), the court held that a person is guilty of driving while under the influence of intoxicating liquor if he or she is

> *to the slightest degree* ... less able, either mentally or physically or both, to exercise the clear judgment and steady hand necessary to handle as powerful and dangerous a mechanism as a modern automobile with safety to himself and the public.

(Emphasis added). *See also Hasten v. State,* 35 Ariz. 427, 431, 280 P. 670, 671 (1929); (evidence sufficient if driver's ability to operate car is affected to the *"slightest extent"* by consumption of alcohol); *State v. Grimes,* 160 Ariz. 329, 330, 773 P.2d 227, 228 (Ariz.App.1989) (same); *State v. Rodgers,* 91 N.J.L. 212, 215, 102 A. 433, 435 (1917) ("any abnormal mental or physical condition which is the result of indulging *in any degree* in intoxicating liquors"); *State v. Noble,* 119 Or. 674, 676, 250 P. 833, 834 (1926) (driver must be shown to have been under the influence of intoxicating liquor *"to some perceptible degree"*); *cf. Shorter v. State,* 234 Ind. 1, 7, 122 N.E.2d 847, 849 (1954) (requiring proof of "the loss of the normal control of one's faculties to a

---

5. Officer Hall described the intoxilyzer as "new state of the art breath testing equipment," similar to but more accurate than the "breathalyz-er," which was previously in use but has now been "completely eliminated."

*marked* degree, caused by drinking intoxicating liquors").[6]

▪▪ Although "appreciable" is, in our view, a more appropriate word than "slightest," *see People v. Haeussler,* 41 Cal.2d 252, 261, 260 P.2d 8, 13–14 (1953), we generally agree with the quoted definition by the Supreme Court of New Mexico of the offense here at issue. It is not necessary to be drunk in order to violate the statute, and the prosecution need not prove any specific degree of intoxication. *Shorter, supra,* 234 Ind. at 7–9, 122 N.E.2d at 850. The question whether the defendant was under the influence of intoxicating liquor is one of fact, to be determined by the court or jury from all of the circumstances. *Id.*

▪▪ In the present case, there was no direct evidence establishing the precise degree to which Poulnot was under the influence of alcohol at the time he was operating his vehicle. There was substantial circumstantial evidence, however, from which the judge could reasonably conclude that Poulnot's "clear judgment and steady hand," *Deming, supra,* 66 N.M. at 180, 344 P.2d at 484, had been appreciably impaired by alcohol at the time he drove so recklessly and caused such a serious accident.

Poulnot acknowledged to Officer Hall that he had consumed two bottles of beer at dinner several hours before the collision. This may not appear to be an especially large amount of alcohol, but the trial judge could reasonably consider the self-serving character of Poulnot's account. In light of the difference, in relation to Poulnot's alcohol consumption after the accident, between what Poulnot told the officer and what his defense witness told the court, and considering Poulnot's obvious interest in minimizing to the police the extent to which he had been drinking, an impartial trier of fact could both reasonably believe that Poulnot had imbibed alcohol before the accident and at the same time question whether "two beers" hours earlier constituted the full extent of Poulnot's indulgence.

Any inference which might reasonably be drawn in the prosecution's favor from Poulnot's admission that he drank beer at dinner was enhanced by his conduct just before the accident and by his condition thereafter. According to the uncontradicted prosecution testimony, Poulnot committed a succession of dangerous violations of the traffic laws over a very short period of time. Moreover, his erratic driving occurred immediately before he struck the Ford Escort. Specifically, Poulnot "tailgated" a car that was then travelling at about the speed limit. Soon thereafter, he passed that car. He failed to make a proper stop at three successive traffic lights. He was also travelling much too fast. Finally, Poulnot smashed into another car with sufficient force to injure its occupants; indeed, he caused the vehicle to burst into flames.

We held in *Stevenson, supra,* 562 A.2d at 624, that it was reasonable for the trial judge to infer that "a person who is not under the influence of something will not drag race on a highway in the District of Columbia." Poulnot was not drag racing but, as in *Stevenson,* his erratic and dangerous operation of his vehicle was more characteristic of someone under the influence of alcohol than of a person of flawless sobriety. At the very least, an impartial trier of fact could rationally so find. *See also Price v. District of Columbia,* 54 A.2d 142, 143 (D.C.1947) (evidence of erratic operation and related conduct admissible as "part and parcel of the driving while under the influence of intoxicating liquor").

Moreover, Officer Hall testified that an hour and a half after the accident, Poulnot's breath, appearance, and condition suggested that he was under the influence of alcohol. Hall also revealed that Poulnot failed all of a series of roadside sobriety tests. About an hour after his condition led Hall to suspect him, Poulnot twice registered .09 percent on the intoxilyzer—almost the .10 percent from which actual intoxication is presumed. *See* D.C.Code § 40–716(b)(1) (1990); *Ransford v. District of Columbia,* 583 A.2d 186, 187 (D.C.1990). Although Poulnot claimed to have con-

---

**6.** All italics in the language quoted in this paragraph have been added by the writer.

sumed additional alcohol after the accident but before the administration of the roadside tests, his statement to the police on that subject differed materially from the testimony of his witness, a fact which understandably precipitated skepticism on the part of the trial judge.[7] Poulnot's appearance and impairment at 4:20 a.m., when the roadside tests were administered, together with the amount of alcohol in his system about an hour later, could reasonably lead even a lay trier of fact who lacked expert scientific knowledge regarding absorption rates (but who was not born yesterday) to conclude that Poulnot was in some measure under the influence of alcohol at the time of the accident.

Individually, each of these circumstances might be regarded as supporting only a suspicion that Poulnot was driving under the influence, and as not establishing guilt beyond a reasonable doubt. We are satisfied, however, that the evidence taken as a whole was more than sufficient to support the trial judge's decision. The trial judge could reasonably decline to attribute to coincidence the fact that Poulnot, who admitted drinking both before and after the accident, operated his vehicle at the time of the accident in a manner which itself suggested that he might well be under the influence of alcohol. Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth.

In reaching the conclusion that the evidence was sufficient, we are mindful of decisions in various jurisdictions which have declined to sustain convictions based on mere suspicion. *See, e.g., Thomas v. State,* 277 Md. 314, 325, 353 A.2d 256, 262 (1976);[8] *State v. Creighton,* 201 N.W.2d 471, 473 (Iowa 1972). We have no quarrel with these holdings. In the present case, however, the circumstantial evidence, when viewed (as it must be) in the light most favorable to the District, goes well beyond suspicion. Indeed, an impartial trier of fact making reasonable credibility judgments and drawing fair inferences from the evidence could properly conclude, beyond any reasonable doubt, that Poulnot operated his vehicle while under the influence of alcohol.

### III

Drawing an analogy to cases involving the chain of custody of tangible exhibits, Poulnot argues that the results of the intoxilyzer tests should not have been admitted into evidence. Noting that he was not in police custody from the time of the accident until about an hour and a half later, and citing testimony that he had consumed alcohol in the interim, Poulnot maintains that his condition at 5:20 a.m. proved nothing because "[t]he integrity of the body content must be maintained until the test is performed." By failing to ensure that he consumed no alcohol after the accident, according to Poulnot, the police rendered the subsequent intoxilyzer tests inadmissible.

▮▮▮ We agree with Poulnot that intoxilyzer tests taken at 5:20 a.m. or thereafter did not, standing alone, constitute conclusive proof that he was under the influence of alcohol two and a half hours earlier. As we recently had occasion to explain in *Martin v. United States,* 606 A.2d 120, 128–129 (D.C.1991), however,

> [o]rdinarily, any evidence which is logically probative of some fact in issue is admissible, *Aherns v. Broyhill,* 117 A.2d 452, 455–56 (D.C.1955), unless it conflicts with some settled exclusionary rule. *Fowel v. Wood,* 62 A.2d 636, 637 (D.C. 1948). "[I]f the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury." *Home Ins. Co. v. Weide,* 78 U.S. (11 Wall.) 438, 440 [20 L.Ed. 197] (1870).

---

7. As the judge remarked during the trial, Poulnot's account to the police "could be a statement to get himself out of being in trouble."

8. The court stated in *Thomas,* in reversing the defendant's conviction for driving while intoxicated:

> When the day arrives ... when a person may be convicted on the basis of suspicion alone, liberty will have vanished from the land.
> 277 Md. at 325, 353 A.2d at 262.

It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable. Thus, the common objection that the inference for which the fact is offered "does not necessarily follow" is untenable. It poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall. EDWARD W. CLEARY, *et al.,* MCCORMICK ON EVIDENCE § 185, at 542–43 (3rd law. ed. 1984). While Poulnot's condition so long after he operated his vehicle was certainly not decisive, the trial judge did not abuse his considerable discretion, *see Roundtree v. United States,* 581 A.2d 315, 328 (D.C. 1990), in admitting the intoxilyzer evidence as one relevant fact in the entire mosaic of evidence tending to show Poulnot's guilt.

■ In *State v. Zantanos,* 150 Vt. 648, 552 A.2d 387 (1988), the defendant contended that the results of a breath test were improperly admitted against him because the prosecution failed to show that he had consumed no liquor between his last operation of a vehicle and the administration of the test fifty minutes later. The Supreme Court of Vermont affirmed the conviction, holding that

> [t]he failure to exclude the possibility that the consumption occurred after operation goes to the weight of the test result evidence, not its admissibility.

*Id.* 552 A.2d at 387. The court also held that the probative value of the evidence outweighed any danger of unfair prejudice

to the defendant. *Id.*[9] In the present case, which was tried by the court without a jury, there was less danger of prejudice than there would have been in a jury trial. *See, e.g., In re S.G.,* 581 A.2d 771, 776–77 & n. 7 (D.C.1990).

## IV

A. On several occasions during the course of the trial, the judge made comments regarding the rate of absorption of alcohol as it related to Poulnot's successive intoxilyzer readings of .09%. In a discussion regarding the admissibility of the intoxilyzer test results, the judge asked rhetorically:

> Well, his alcohol would be going down at the rate of .045 every 45 minutes wouldn't it?

The judge next returned to the subject during argument:

> Well, how did he get to .09 with two beers? That is a pretty difficult thing to do.... He is losing—he lost .01 in the hour [after] he met Detective Hall. He had to lose .01 because you lose .01 per hour, right?

He then continued his assessment in some detail, apparently somewhat inconsistently with his prior calculations:

> THE COURT: You lose .01 for each 40 minutes of drinking. So how did he get to the .09 because he is losing? When you sit in a bar and you drink—let's say we go to a bar and we are drinking, and we are drinking right through an hour, and we have put in three or four beers we will say, a beer every 15 minutes. So we've had four beers. That's 12 ounces. While we are doing that drinking, we are

**9.** We need not and do not decide whether the evidence regarding the results of the belated intoxilyzer tests would have been admissible in a prosecution for the *"per se"* offense of driving while intoxicated, *i.e.,* operating a vehicle while the defendant's blood contained .10 percent or more of alcohol. *See* D.C.Code § 40–716(b)(1) (1990); *Ransford, supra,* 583 A.2d at 188; *Bungardeanu v. England,* 219 A.2d 104, 109 (D.C. 1966); *cf. District of Columbia v. Bennou,* 116 Daily Wash.L.Rptr. 2685, 2685–87 (Super.Ct.D.C.1988) (Weisberg, J.). We note, however, that in *Bennou,* the District apparently argued, and thus conceded, that in a *per se* case,

breath test evidence is sufficient if (and thus presumably only if) "a defendant had a [blood alcohol content] of at least .10 percent upon being tested within a reasonable time thereafter, *as long as there has been no consumption of alcohol in the interim." Id.* at 2688 (emphasis added). The trial judge, while finding evidence of blood alcohol content after the fact to be insufficient to prove guilt in a *"per se"* case, *cf. Ransford, supra,* thought that "the government is not without a remedy, since a prosecution for driving under the influence would lie in most cases." *Id.*

losing .10 every 40 minutes out of what we are putting into our body. So in the hour and 10 minutes that Hall had him in exclusive company, he had to be losing .01 at that time, right? Wouldn't he? While he was drinking—if he was drinking with the gentleman, had those two beers, he would be losing .01 per hour?

MR. SHEPHERD [Defense Counsel]: Well, I understand what you are saying, Your Honor. I don't know how fast one loses alcohol.

THE COURT: Well—

MR. SHEPHERD: Nor do I know how much a Heineken contains.

THE COURT: It is 12 ounces. All beer contains the same, right?

MR. SHEPHERD: Your Honor, I do not know that all beer contains the same amount of alcohol.[10]

THE COURT: Well, as far as I know, it does. Two beers will raise you to .05, but you lose .0 [11] while you are drinking. . . .

Finally, in finding Poulnot guilty, the judge stated that there was "no way on earth" that two beers could have accounted for the intoxilyzer results "when you consider the fact that he is losing .01 every 40 minutes." He thus carried over the comments which he had made during the trial on this controversial theme into his disposition of the case.

Poulnot contends that the trial judge erred in purporting to take judicial notice of the rate at which Poulnot's body gained alcohol content by drinking beer or lost it by the subsequent passage of time. We agree with Poulnot.

The law is not an ethereal discipline. It does not require judges to shut their minds to that which all others can see or understand. *See Child Labor Tax Case*, 259 U.S. 20, 37, 42 S.Ct. 449, 450, 66 L.Ed. 817 (1922). "When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men [or women]." *Edwards v. Habib*, 130 U.S.App.D.C. 126, 140, 397 F.2d 687, 701 (1968), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969) (citation and internal quotation marks omitted).

■ "[W]here a fact is well-known by all reasonably intelligent people in the community, or its existence is so easily determinable with certainty from unimpeachable sources, it would not be good sense to require formal proof." *Harper v. Killion*, 345 S.W.2d 309, 311 (Tex.Civ.App.), *aff'd*, 162 Tex. 481, 348 S.W.2d 521 (1961).[12] Instead, under either of these circumstances, the court may invoke the doctrine of judicial notice, which is essentially an expression of common sense. *Id.* As the court put it in *Varcoe v. Lee*, 180 Cal. 338, 344, 181 P. 223, 226 (1919) "[j]udicial notice is a judicial shortcut, a doing away . . . with the formal necessity of evidence because there is no real necessity for it." *See also* 2 JOHN W. STRONG, MCCORMICK ON EVIDENCE, § 328, at 382–88 (4th ed. 1992). In fact,

---

10. Defense counsel's reluctance to accept the judge's hypothesis was quite reasonable, for while, according to Gertrude Stein, a rose is a rose is a rose, some beers are more equal than others:

> Beer, of late, has quite a variety of alcohol contents, especially with the increased popularity of "light" (diet) beers, as well as "low-alcohol" beers, and with more imported beers now being sold on the domestic market. Beers, unlike other alcoholic beverages, do not state their alcohol percent on the container. In addition, the alcohol content of the beer itself is deliberately varied to some extent by the manufacturer during production. . . .
> The sizes of the beer containers also vary (*i.e.,* both 12 and 16 ounce cans are now commonplace) and the subject's specific consumption may include cans, bottles, pitchers,

glasses, or paper cups of numerous sizes and shapes, all of which can be important to your calculations when someone reports having had "five beers."

EDWARD F. FITZGERALD & DAVID N. HUNE, INTOXICATION TEST EVIDENCE: CRIMINAL AND CIVIL, § 3.8, at 90 (1987 & 1991 Supp.) (hereinafter INTOXICATION TEST EVIDENCE).

11. The trial transcript does not show the complete decimal to which the judge was referring.

12. *See also* FED.R.EVID. 201(b):

> (b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

"[t]he failure to [take judicial notice in appropriate cases] tends to smother trials with technicality and monstrously lengthen them out." *Id.* § 332, at 402 (quoting JAMES THAYER, PRELIMINARY TREATISE ON EVIDENCE 309 (1898)).

The common sense principle recognized by these authorities applies to the subject at hand. A judge may take judicial notice of well-known and undisputed facts about the effect of alcohol on the human body. As the Supreme Court of Oregon explained in *Noble, supra,* 250 P. at 834,

[i]t is a matter of common knowledge that the drinking of intoxicating liquors, even in small quantities, has some effect upon the person drinking it, and that this effect continues for a longer or shorter period, according to the amount drunk, and the individual drinking it.

In the present case, however, the trial judge went well beyond matters of common knowledge or facts readily determinable from unimpeachable sources. Without the aid of expert testimony, he attempted to make precise calculations based on specific absorption rates. This was impermissible. Even assuming, *arguendo*, that the judge as an individual knew that alcohol is absorbed into the body at the rate described by him—and we think the variables in the situation are such that it might well be impossible for anyone to possess such knowledge—"the doctrine is accepted that actual private knowledge by the judge is no sufficient ground for taking judicial notice of a fact as a basis for a finding or a final judgment." 2 McCORMICK, *supra,* § 329, at 390.

In *St. Lewis v. Firestone,* 130 A.2d 317 (D.C.1957), the plaintiff's apartment was damaged by smoke from an adjoining unit in which a man had died in a fire. The plaintiff sought to establish negligence as the cause of the fire by proof that the decedent's blood alcohol content was 0.27 percent. No expert testimony was offered, however, with regard to the significance of that finding. The court was not persuaded by the plaintiff's contention:

Assuming the admissibility of the record, the evidence has no probative value. No attempt was made by the appellee through expert or medical testimony to define or establish the scientific meaning of 0.27 percent or its effect on the decedent and courts cannot take judicial notice of such meaning or effect. Judicial notice may be taken only of such scientific facts known to all men of ordinary intelligence or such facts as are recognized by statute.[13]

*Id.* at 320 (footnote omitted).

In *Bennou, supra,* Judge Weisberg declined to take judicial notice of the very kinds of alleged scientific facts on which the trial judge relied in the present case:

The court assumes, of course, that defendant's b.a.c. was higher than .10 percent when he was operating his vehicle. This assumption, however, is based on nothing more than the court's understanding, right or wrong, of body metabolism and the rate at which alcohol is normally absorbed into the blood. Even if the court's understanding is correct, it obviously can not take judicial notice of these facts; the government has to prove them.

116 Daily Wash.L.Rptr. at 2688 n. 4. We agree with Judge Weisberg's assessment.

Moreover, as we recognized in *Ransford, supra,* 583 A.2d at 190, (quoting *State v. Taylor,* 132 N.H. 314, 320, 566 A.2d 172, 175–76 (1989)),

the rate of absorption of alcohol varies considerably between individuals.[14] One study found that the peak blood alcohol level is reached, after consumption, in anywhere from 14 to 138 minutes. *Nichols, supra,* § 23:05 (Supp.

---

**13.** It bears noting in connection with the *St. Lewis* decision, however, that "the content of what will actually be [judicially] noticed is subject to change as the tenets of science evolve." 2 McCORMICK, *supra,* § 330, at 394 & n. 16.

**14.** *See* STEPHEN M. BRENT & SHARON P. STILLER, HANDLING DRUNK DRIVING CASES, § 3:8, at 34 (1985) ("The normal range of clearance rates is between .01 [and] .02 per hour, but values as high as .04 percent and as low as .006 percent have been observed.")

1989).[15] The extrapolation evidence is further complicated by the amount of food consumed by the defendant at the time he consumes alcohol, which affects the rate of absorption.

*See also* INTOXICATION TEST EVIDENCE, *supra*, § 2.9, at 16 ("PRESENCE OF FOOD HAS A DRAMATIC EFFECT ON BAC CURVE"). These and other variables render this area a treacherous one indeed for use of judicial notice as a fact-finding resource.[16]

A different question might well be presented if the judge had confined himself to an observation that it was improbable that consumption of "two beers" a couple of hours before the intoxilyzer tests were administered would alone have brought about Poulnot's condition and the test results as described by Officer Hall. The judge attempted, however, to take judicial notice of a good deal more than that. The facts which he purported to find by resort to judicial notice were neither matters of common knowledge nor capable of certain verification. *See* 2 McCORMICK, *supra*, §§ 329–330, at 388–97. Accordingly, we hold that the doctrine was incorrectly invoked.

■ B. We are satisfied, however, that the error which we have discerned in the judge's resort to judicial notice was harmless. The judge's discussion of alcohol absorption rates and related matters was directed primarily, if not exclusively, to the significance of the results of intoxilyzer tests which were administered to Poulnot beginning at 5:20 a.m., two and half hours after he last operated an automobile. The judge also had before him, however, the uncontradicted testimony of Officer Hall regarding Poulnot's condition at 4:20 a.m., only an hour and a half or so after the accident. The 4:20 a.m. evidence was closer to the time that Poulnot drove, and thus more probative of his condition behind the wheel.

At 4:20 a.m., as we have noted, Poulnot failed all of the sobriety tests which Officer Hall directed him to take. Poulnot's breath, eyes, clothes and general bearing all likewise indicated significant consumption of alcohol. It is undisputed that he drank no more between his unsuccessful attempts to master the roadside test and his subsequent encounter with the intoxilyzer. Moreover, the results of these later breath tests, which showed near intoxication, tended to corroborate Officer Hall's testimony regarding Poulnot's condition an hour earlier.

Under these circumstances, the judge's comments about the alleged loss of .01 in alcohol content every hour (or every forty minutes) did not significantly affect the force of the evidence against Poulnot. Although the judge concededly alluded to "the *fact* that [Poulnot] is losing .01 every forty minutes" in finding Poulnot guilty, it is difficult to conjure up a scenario under which he could have reached a different conclusion even without the calculations which we have held to be impermissible.

■ We recognize that error in the admission of evidence may not be found harmless simply because the remaining evidence is sufficient to support a finding of guilt beyond a reasonable doubt. *See Clark v. United States*, 593 A.2d 186, 192 (D.C.1991). Nevertheless, we are satisfied "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.*, (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

We have considered an arguably plausible alternative disposition of this appeal. Instead of affirming the conviction outright, we could remand the case to the trial judge with instructions to reconsider the question of Poulnot's guilt but to exclude from his calculus the alleged facts as to

---

**15.** The reference is to DONALD H. NICHOLS, DRINKING/DRIVING LITIGATION (1985).

**16.** "One scientist argues that at least 60 minutes is [sic] required for absorption, and that at least 120 minutes should be allowed after the

end of drinking to ensure complete absorption. Others argue, however, that a majority of individuals will reach peak absorption in 30–35 minutes." NICHOLS, *supra*, note 15, § 23:06, at 23–36.

which we have held that he erroneously took judicial notice. The judge's reference to the absorption rate in finding Poulnot guilty could perhaps be viewed as supporting such a remand. Since we are confident, however, that in spite of this allusion, the judge's decision was not substantially swayed by what we have determined to be error, we conclude that a remand would serve no useful purpose. *See In re Melton,* 597 A.2d 892, 908 (D.C.1991) (en banc).

## V

For the foregoing reasons, the judgment appealed from is hereby

*Affirmed.*