Myra ROBINSON, Appellant,

v.

Randolph EVANS, Appellee.

No. 84–445.

District of Columbia Court of Appeals.

Argued Dec. 5, 1984.
Decided Feb. 17, 1989.

---

St. John Barrett, Washington, D.C., for appellant.

Jeffrey B. Fisher, Marlow Heights, Md., for appellee.

Before ROGERS, Chief Judge,* and TERRY and STEADMAN,** Associate Judges.

TERRY, Associate Judge:

This appeal challenges an order granting partial summary judgment to appellee Evans on his complaint for a sale of certain property in lieu of partition, and for an accounting. The effect of that order was to require the sale of a house in which appellant Robinson [1] had been living since 1962. We hold that summary judgment was improperly granted and remand the case to the trial court for further proceedings.

I

The parties began living together in 1952, although at the time each was purportedly married to someone else. In 1958 their daughter was born. In 1962 they and their daughter moved into a house on Buchanan Street, N.W. Initially they rented the house, but in 1964 the owner decided to sell it, so they contracted to buy it for $17,950. The contract, which is in the record, states that the property was "to be conveyed in the name of Randolph Evans and Myra Evans, his wife, as Tenants by the Entirety," and it is undisputed that it was so conveyed in October 1964. The parties made a down payment of $2,500 [2] and obtained a mortgage for the balance of the purchase price.

In July 1965 Mr. Evans moved out of the Buchanan Street house, leaving behind appellant Robinson and their seven-year-old daughter.[3] Robinson continued to live in the house and made all but four or five of the remaining mortgage payments until the mortgage was fully paid in November 1983. An appraisal in March 1984 determined that the value of the house was $62,500; by now it is probably worth somewhat more.

Appellee Evans brought this action under D.C.Code § 16–2901 (1981) for a sale of the Buchanan Street property in lieu of partition, and for an accounting. The complaint averred that Evans and Robinson

---

* Judge Rogers was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on November 1, 1988.

** The late Hubert B. Pair, Senior Judge, was a member of the division that heard oral argument. After he withdrew from the case because of illness, Judge Steadman was chosen by lot to replace him.

1. We shall refer to appellant by the name of Robinson throughout this opinion, although at various times pertinent to this case she has also been known as Myra Moody and Myra Evans.

2. Although each party contributed to the down payment, the exact amount of their respective contributions is in dispute.

3. In the meantime Mrs. Robinson's first husband, Claude Moody, had died on March 13, 1965. Appellant married Lewis Robinson in August 1979.

owned the house as tenants in common,[4] that it was not susceptible to partition in kind, and that Robinson had collected rents and had not accounted to Evans for his share. Robinson filed an answer denying each of these allegations. In due course the case was set for a non-jury trial, but on the scheduled trial date Robinson did not appear. Evans, however, presented his case, and after hearing the evidence, the court issued written findings of fact, conclusions of law, and a judgment in his favor.

Nine months later, with new counsel, Robinson filed a motion to vacate the judgment and for leave to file an amended answer. Attached to the motion was an affidavit in which Robinson stated that her counsel had failed to advise her to appear for trial and that she had several meritorious defenses to Evans' suit. The court granted her motion and vacated the earlier judgment.

Robinson, represented by new counsel, then filed an amended answer in which she again denied that she and Evans owned the property as tenants in common and that she had collected rents without accounting to Evans for his share.[5] She also alleged that at the time they had purchased the house on Buchanan Street, she and Evans had intended to "live therein as man and wife," that Evans had represented to her that that was his intention,[6] and that when he moved out in 1965, Evans had "abandoned his relationship with [her] as man and wife...." In addition, Robinson presented an affirmative defense and a counterclaim, asserting that Evans held "legal title to the property in constructive trust for her" and requesting that the court enter an order quieting title in her in fee simple.

On January 17, 1984, Evans filed a motion for partial summary judgment on the issue of his right to compel a sale of the property in lieu of partition. Robinson filed an opposition to this motion on February 1, but on February 2 the court entered an order granting what it characterized as Evans' "unopposed" motion,[7] and appointing a trustee to sell the property in accordance with Super.Ct.Civ.R. 308(c). Robinson's counsel quickly informed the court that the motion was not unopposed,[8] and soon thereafter the court scheduled a hearing on "all pending motions" for April 3. At the hearing, the court "advised counsel that it had not formally vacated the order of February 2, 1984, and that it would hear argument and, upon the conclusion of argument, would decide whether said order should have been granted in the first

---

4. Evans admitted in his complaint that "[t]he land records reflect that the parties own this property as tenants by the entirety," but alleged that because they were never married to each other, they actually owned it as tenants in common. But see note 18, *infra*.

5. She admitted, however, that the property was not susceptible to partition in kind.

6. Robinson also alleged that before they purchased the house, Evans had represented to her that he intended to marry her "and that there was no legal impediment to his doing so." She further stated that from 1951 until Evans moved out in July 1965, "plaintiff and defendant lived together as man and wife, held themselves out to the community as man and wife, and by their conduct consummated a common law marriage under the law of the District of Columbia."

7. The order had been drafted by Evans' counsel and submitted with the motion, as required by Super.Ct.Civ.R. 12–I(e). The word "unopposed," however, was written in by hand, apparently by the motions judge.

8. In a letter to the clerk of the court dated March 14, 1984, Robinson's counsel stated that he had received the court's order granting Evans' allegedly "unopposed" motion on February 10, that he went to the Clerk's Office the following day to verify that the motion had in fact been opposed, that his opposition was then found among some "loose papers," and that an "assistant" in the Clerk's Office "assured" him that the order would be returned to the judge "so that he might vacate it, and that it would not be necessary for me to file a motion." When he heard nothing further after several days, counsel began to call the Clerk's Office and eventually paid the office another visit, only to learn that there was no record that the file had been returned to the judge. "Further calls have availed me nothing." Counsel therefore requested confirmation "that it is unnecessary for me to file a motion to vacate the Court's order." The record contains no response to counsel's letter.

place." [9] At the conclusion of the hearing, the court determined that there was no genuine issue of material fact and that Mr. Evans was entitled to judgment as a matter of law. Accordingly, it "affirmed" the February 2 order.

Robinson filed a notice of appeal on April 6 designating the "order" of April 3 as the one from which this appeal was taken. On May 10 she filed a "supplementary notice of appeal" in which she identified the orders of February 2, April 3, and April 26 (see note 9, *supra* ) as the subjects of the appeal.

## II

■ Before we reach the merits, we must deal with a preliminary jurisdictional issue. It has long been established that prescribed time limits for noting an appeal are mandatory and jurisdictional. If the notice of appeal is not timely filed, the appellate court has no jurisdiction to hear the case, and the appeal must be dismissed. *E.g., United States v. Robinson*, 361 U.S. 220, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960); *Howard University v. Pobbi–Asamani*, 488 A.2d 1350, 1353 (D.C.1985); *Brown v. United States*, 379 A.2d 708 (D.C.1977). There is, however, a narrow exception to this rule. When the appellant has been affirmatively misled into delaying the filing of a notice of appeal by some action or conduct of the trial court, the appeal will be allowed if the notice of appeal is timely filed after the misleading action has been corrected. *E.g., Thompson v. Immigration & Naturalization Service*, 375 U.S. 384, 386–387, 84 S.Ct. 397, 398–99, 11 L.Ed. 2d 404 (1964); *Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc.*, 371 U.S. 215, 217, 83 S.Ct. 283, 285, 9 L.Ed.2d 261 (1962); *Center for Nuclear Responsibility, Inc. v. United States Nuclear Regulatory Com-*

*mission*, 251 U.S. App.D.C. 82, 88, 781 F.2d 935, 941 (1986); *Willis v. Newsome*, 747 F.2d 605, 606–607 (11th Cir.1984), *opinion after remand*, 771 F.2d 1445 (11th Cir. 1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986). We hold that the unusual circumstances of this case bring it within the narrow exception.[10]

It is clear that the only appealable order in this case is the order of February 2 appointing a trustee to sell the property at issue.[11] The April 26 order grants no further relief but merely "affirms" the February 2 order. The April 3 ruling was oral, not written. Since the record contains no transcript of the April 3 hearing, the only evidence of the court's ruling is in the docket entry for that date and in the April 26 order. The docket entry merely states, "The court after full hearing grants motion for partial summary judgment," which is exactly what it had done on February 2. It is in fact the April 26 order which embodies in writing what the court did on April 3. Since the April 26 order grants no new relief to anyone, it cannot serve as the final order for the purpose of an appeal.

This is where the *Thompson–Harris* exception comes into play. When appellant Robinson's counsel learned of the February 2 order on February 10, he went to the Clerk's Office the next day to complain that the order did not reflect the true state of affairs, namely, that Evans' motion was not "unopposed" as the order stated. Counsel was assured by an "assistant" in the Clerk's Office that he need not file a motion to vacate the order because the judge would vacate it on his own (see note 8, *supra* ). The judge, however, failed to do so, and consequently Mrs. Robinson's time for noting an appeal ran out. When the judge advised counsel at the April 3 hearing that he "had not formally vacated"

9. The quoted language is taken from a later order, dated April 26, 1984. This order, like the earlier one, was prepared by Mr. Evans' counsel. The record does not contain a transcript of the April 3 hearing. .

10. This exception has been recognized in a variety of factual situations, all involving some affirmative conduct on the part of the trial court (or its clerk) which misled the appellant. *See*

*Center for Nuclear Responsibility, supra,* 251 U.S.App.D.C. at 88 n. 11, 781 F.2d at 941 n. 11.

11. D.C.Code § 11–721(a)(2)(C) (1981) gives this court jurisdiction of appeals from interlocutory orders "changing or affecting the possession of property...." There can be no doubt that the February 2 order fits within this classification.

the February 2 order, it was too late for Mrs. Robinson or her counsel to repair the damage.

Under the circumstances, we think the only proper course for the trial court was to vacate the February 2 order as soon as it learned of its original error. The procedural fudging in which the court engaged—holding a hearing on "all pending motions," but without "formally vacat[ing]" the earlier order—significantly prejudiced Mrs. Robinson by depriving her of an opportunity to seek appellate review of the court's ruling. The full extent of the prejudice was not apparent until the court issued its April 26 order purporting to "affirm" the February 2 order, without first vacating it so that the time for noting an appeal would begin to run anew. Since the supplementary notice of appeal was timely filed with respect to the April 26 order,[12] we hold that we have jurisdiction to entertain this appeal.

We emphasize that our invocation of the *Thompson* and *Harris* line of cases is based on the court's failure to vacate the February 2 order, not on the representations made to counsel by the "assistant" in the Clerk's Office. We would be most reluctant to rely solely on the statements or actions of an unidentified court functionary as grounds for bypassing the jurisdictional requirements of our rules. The significant fact here is that the motions judge was made personally aware of what had happened by counsel's March 14 letter. The letter itself states that a copy was sent to the judge, and the copy that is in the court file bears a rubber-stamped imprint saying

that it was "RECEIVED" on March 15, 1984, in the judge's chambers. Despite the procedural confusion revealed by counsel's letter, the judge did nothing to protect Mrs. Robinson's rights. He allowed the February 2 order to remain unvacated and thereby prevented Mrs. Robinson from filing a timely notice of appeal. That is the error which *Thompson* and *Harris* enable us to correct.

Having determined that we have jurisdiction, we turn our attention to the merits.

### III

It is undisputed that the parties were never ceremonially married. However, in her amended answer to the complaint, Mrs. Robinson alleged facts sufficient to prove the existence of a common-law marriage between her and Mr. Evans, provided that there was no impediment to such a marriage. See note 6, *supra*. In her first deposition Mrs. Robinson testified that she and Mr. Evans "started living together in 1952 as man and wife" and that Mr. Evans had told her that he had been divorced from his first wife, although she "never saw any papers."[13] She also said that "we signed papers together as Mr. and Mrs. Evans" and that "we had been living together so long that I felt that I was [his wife].... I just took it for granted." During the time they lived together, she testified, they both represented themselves to the public as "Mr. and Mrs. Evans." She stated later in an affidavit that when she and Mr. Evans first moved into the Buchanan Street house, they were "living as man and wife."[14] Finally, the convey-

---

**12.** The April 26 order was not entered on the docket until May 4. The supplementary notice of appeal was filed six days later, on May 10, well within the thirty-day limit prescribed by this court's Rule 4–II(a)(1) (1984). The rule was amended and renumbered in 1985—it is now Rule 4(a)(1)—but the thirty-day period for noting an appeal in a civil case was not changed.

**13.** Mrs. Robinson also testified that her first husband, Mr. Moody, had told her in 1949 that *he was getting* a divorce and that she never saw him any more after that. Although she never received any divorce papers, she no longer considered herself to be Mr. Moody's wife. She learned of his death in 1965 from a friend who

saw his obituary in a newspaper. Shortly thereafter she obtained a copy of Mr. Moody's death certificate, which is attached as an exhibit to her deposition. In the space designated for "Name of Surviving Spouse," the certificate states "None."

**14.** Mrs. Robinson's deposition testimony shows that she clearly understood the concept of a common-law marriage:

[A] common-law [marriage] is living together and everybody is thinking that you are man and wife, married. That is the way we presented ourselves; that is the way everybody thought we were, man and wife. Even people right now call me, on the street that I

ance of the property to "Randolph Evans and Myra Evans, his wife, as Tenants by the Entirety" at least suggests the existence of a common-law marriage.

To counter this evidence, Mr. Evans testified in a deposition that he had been ceremonially married in 1944 in South Carolina to another woman,[15] that he had never been divorced, and that when he and Mrs. Robinson were living together, they were "just shacking." He also denied that he ever referred to her as his wife or as "Mrs. Evans."

In the District of Columbia common-law marriages have been recognized by the courts for almost sixty years. *See Hoage v. Murch Bros. Construction Co.*, 60 App.D.C. 218, 50 F.2d 983 (1931). If proven by a preponderance of the evidence,[16] a common-law marriage is as valid as any performed by a magistrate or a member of the clergy. Thus it is crucial in this case to determine whether there was ever a common-law marriage between the parties, for if there was, then they owned the Buchanan Street house as tenants by the entireties, and the property cannot be partitioned (or sold in lieu of being partitioned) at the behest of one party over the objection of the other. *See Miller v. Miller*, 487 A.2d 1156, 1157 (D.C.1985) ("a tenancy by the entireties precludes any other transfer or conveyance of the property"); *Coleman v. Jackson*, 109 U.S. App.D.C. 242, 243, 286 F.2d 98, 99 (1960) ("in tenancy by the entireties [it is] impossible for one cotenant ... to compel a partition of the property"), *cert. denied*, 366 U.S. 933, 81 S.Ct. 1656, 6 L.Ed.2d 391 (1961).

We conclude that the evidence of record is sufficient to raise a genuine issue as to the existence of a common-law mar-

riage. Whether the parties could be married depends, of course, on whether each was lawfully married to someone else at any time during their period of living together, from 1952 to July 1965. Assuming that Mrs. Robinson's first marriage was never dissolved by divorce, any impediment to her marriage to Mr. Evans vanished upon the death of her first husband, Mr. Moody, on March 13, 1965. Consequently, a trier of fact could find that a common-law marriage existed between Robinson and Evans at least from that date until Mr. Evans' departure in July 1965, provided that there was no other bar to such a relationship.

The potential fly in the ointment, obviously, is the marital status of Mr. Evans. The 1944 marriage certificate (see note 15, *supra*) is *prima facie* evidence of a valid marriage between him and Dorthea McQueen. We think, however, that Mrs. Robinson's deposition testimony was sufficient to raise a genuine issue as to the continuing existence of that marriage. She stated that Mr. Evans had told her, when they first started living together, that he had been divorced from his first wife. Although this may or may not be enough to convince a trier of fact that there was no impediment to the creation of a common-law marriage, it is enough to preclude summary judgment, for it at least casts a cloud on Mr. Evans' marital status during the critical period of time. Mrs. Robinson should have an opportunity to present to a trier of fact any evidence she may have on this issue.[17]

## IV

There is yet another reason why summary judgment was erroneously grant-

---

live, that; the children call me that. So that is what everybody had thought.

**15.** In his statement of material facts not in dispute, filed under Super.Ct.Civ.R. 12–I(k), Evans' counsel stated that Evans "was married to Dorthea L. McQueen on May 24, 1941, in South Carolina; the bonds of said marriage have not been severed by divorce or death." However, a copy of the marriage certificate between Evans and McQueen is in the record, and it shows that the marriage took place in 1944, not 1941.

**16.** *East v. East*, 536 A.2d 1103, 1105–1106 (D.C. 1988).

**17.** We recognize, of course, that if a common-law marriage were found to exist between the parties, it would surely have an effect on Mrs. Robinson's marriage to her present husband. What that effect might be is something that need not be decided here.

ed in this case. Even if it turns out that the parties here were joint tenants [18] rather than tenants by the entireties, Mr. Evans' right of partition may not be unfettered. This court held in *Carter v. Carter*, 516 A.2d 917, 921 (D.C.1986), that the right of partition, like most property rights, is "subject to possible limitation by voluntary act of the parties or in its initial creation." On the record before us, we hold that there is a genuine issue of material fact as to the existence of any such limitations which would preclude partition of the Buchanan Street house.

In *Coleman v. Jackson, supra,* a piece of property was conveyed to Coleman and Jackson as tenants by the entireties, which would have created both a right of survivorship and a bar to alienability. Because they were not married, however, a tenancy by the entireties could not be created. After Jackson's death, his heirs sued Coleman, asserting that the conveyance had created a tenancy in common, which would have entitled them to half of the property. Rejecting their claim, the court held that the use of the words "tenants by the entireties" in the deed was evidence of the parties' intent to create a right of survivorship, especially in the absence of any evidence to the contrary. "The words 'tenants by the entireties' are an expression of intent that the court cannot ignore." 109 U.S.App.D.C. at 246, 286 F.2d at 102 (footnote omitted). Therefore, even though a tenancy by the entireties was legally impossible, the parties' intent to create a right of survivorship must be honored. To effect that intent, the court ruled that the deed created a joint tenancy in Coleman and Jackson, so that Coleman, by right of survivorship, became the sole owner of the property upon Jackson's death.

Reading the *Coleman* case in light of our recent decision in *Carter v. Carter, supra,* we hold that the conveyance of the Buchanan Street property in this case to Robinson and Evans as tenants by the entireties raises a material issue of fact as to their intent, at the time of the conveyance, to limit the right of either to seek partition of the property. Since a tenancy by the entireties cannot be partitioned, a trier of fact might well infer that the parties, by choosing this particular form of conveyance, expressed their intent *not* to partition. *Carter* establishes that the parties had the power to restrict their own right to seek partition, and *Coleman* holds that the words and form of the conveyance itself are evidence of the parties' intent. At the very least, this is an issue which cannot be decided by summary judgment.

## V

■ Finally, we reject Mrs. Robinson's claim of a constructive trust. Though we recognize that a constructive trust is "a flexible remedial device," we also recognize that its purpose is "to force restitution in order to prevent unjust enrichment." *Hertz v. Klavan*, 374 A.2d 871, 873 (D.C. 1977); *accord, Gray v. Gray*, 412 A.2d 1208, 1210 (D.C.1980); *Osin v. Johnson*, 100 U.S.App.D.C. 230, 233, 243 F.2d 653, 656 (1957). The record here reveals neither actual nor potential unjust enrichment. Mr. Evans contributed some of his own resources to the purchase of the Buchanan Street house. Although the value of his contributions may be in dispute, he will not be unjustly enriched either by the sale of the property or by allowing Mrs. Robinson to buy out his share, once its value is determined. His abandonment of the household and family does not justify the creation of a constructive trust. *Miller v. Miller, supra,* 487 A.2d at 1157.

## VI

The judgment of the Superior Court is reversed, and this case is remanded for further proceedings consistent with this

---

**18.** Mr. Evans is wrong in asserting that he and Mrs. Robinson own the Buchanan Street property as tenants in common. In the District of Columbia it is settled law that if a conveyance to two parties as tenants by the entireties cannot take effect because the parties are not husband and wife, then they take title as joint tenants. *Coleman v. Jackson, supra.*

opinion.[19]

REVERSED AND REMANDED.

19. If ever a case cried out for settlement, this is such a case; we are at a loss to understand why it was not settled long ago. It is plain to us that Mr. Evans simply wants to recoup his share of the value of the house; that is obvious from the very nature of this suit, as well as his deposition. Moreover, Mrs. Robinson testified in her second deposition that, as far back as 1967, she was contacted by a lawyer who told her that Mr. Evans "wanted his share out of the house." Mrs. Robinson, on the other hand, has repeatedly made clear that what she wants more than anything else is to be able to keep the house and live in it for the remainder of her days. In an affidavit filed in 1982, she said:

Ever since I first made the house … my home in 1964, I have done everything possible to keep it in good condition. I have had it painted every year. I have improved it inside and out, such as by adding a new brick front porch, by replacing the back steps, and by building a retaining wall. I have worked hard on the garden and have flowers or lawn everywhere. I have lived through bad times as well as good times in the house, but I am proud of it and want it to be my home for the rest of my life.

In paragraph 7 of her amended answer, Mrs. Robinson stated that she had lived in the house "longer than she has [lived] in any other home during her adult life and desires to continue residing in it as her home."

In these circumstances it should not be difficult for the parties to reach some accommodation of their respective claims. Mr. Evans essentially wants to dispose of his share of the house by receiving payment for what he put into it, and Mrs. Robinson appears to be willing to buy him out. Since the house is not encumbered by a mortgage, she could probably obtain financing that would enable her to do so. The only matter in dispute, really, is the value of Mr. Evans' share, and it should not be too difficult to determine that. We do not know why a settlement has not been attempted sooner, but whatever the reason may have been—the intransigence of the lawyers, bad blood between the parties, or simple inertia—we urge the parties on remand to try to resolve this dispute without forcing Mrs. Robinson to give up the home she has lived in for a quarter of a century.