Peter J. LYNN, Appellant,

v.

James A. LYNN, et al., Appellees.

No. 89–CV–1545.

District of Columbia Court of Appeals.

Argued April 16, 1991.
Decided Dec. 11, 1992.

---

Jerry R. Goldstein, Washington, DC, for appellant.

W. Steven Paleos, Alexandria, VA, for appellees.

Before ROGERS, Chief Judge, and SCHWELB and WAGNER, Associate Judges.

WAGNER, Associate Judge:

This appeal arises out of an action for sale of real property in lieu of partition and for an accounting pursuant to D.C.Code § 16–2901 (1989). Appellant contends that he was denied procedural due process in the proceedings in the trial court which resulted in the sale of two properties and an order approving the sale of a third. Appellant also argues that the trial court erred in rejecting his offer to purchase a third property which he made at the hearing held pursuant to an order nisi and in confirming a published offer for it.[1] Some

---

1. The rule governing procedures for confirmation of a private sale of real property provides

for publication of the terms of an offer to pur-

of appellant's claims of procedural irregularities were raised in a prior appeal which was dismissed by this court because appellant failed to comply with the court's order to designate the record on appeal.[2] Additionally, appellant did not note an appeal from some of the other orders which he seeks to challenge in this appeal. Under the circumstances, we do not reach many of the issues raised by appellant in his brief. As to the issue properly before the court, we hold that the trial court erred in confirming the sale for one of the properties in view of the offer made by appellant. Therefore, we remand the case to the trial court for further proceedings consistent with this opinion.

# I

## Procedural Background

The procedural history of this case is somewhat complicated, but it must be recounted in some detail for an understanding of our disposition of the case. On April 25, 1988, appellees, James and Jeffrey Lynn, a father and son, filed a complaint for the sale in lieu of partition of real property and for an accounting against appellant, Peter Lynn, who is also the son of James Lynn.[3] Although represented by counsel, appellant filed an answer *pro se* on August 8, 1988, and on August 16, 1988, his attorney filed a motion for leave to withdraw.[4] In the answer, appellant alleged that the appellees had invested in his real estate business and had promised, but failed to reimburse him, for expenses associated with the business. Appellees filed a motion for partial summary judgment on August 26, 1988 seeking, *inter alia*, a sale in lieu of partition of three properties in which they claimed an ownership interest as tenants in common with appellant. Appellant filed a motion to dismiss the complaint, claiming that the case had been dismissed previously and not reinstated.[5] By order dated October 31, 1988, Judge Ronald Wertheim denied appellant's motion to dismiss, granted appellant's attorney leave to withdraw, and granted appellant an extension of time to and including November 18, 1988 to file an opposition to the motion for partial summary judgment.

Appellant did not file an opposition to the motion for partial summary judgment, and Judge Harriett Taylor entered an order on November 22, 1988 granting the motion as unopposed.[6] The order for partial summary judgment specified the extent of each party's interest in each of the three properties, ordered the properties to be appraised by three appraisers and appointed a trustee to sell it at private sale pursuant to Super.Ct.Civ. 308(c).[7] The order also authorized the trustee to list the property for sale with a real estate broker, to manage it and collect rents, and to pay expenses subject to an accounting. No hearing was

---

chase and for consideration of higher offers by the court. The pertinent portion of the applicable rule states:

> Order nisi increased offer; confirmation. At least 10 days before confirmation of a private sale the terms thereof shall be published in such newspaper or newspapers of general circulation in the District of Columbia as the Court may direct, and the sale shall not then be confirmed if a bona fide offer has been made, under such conditions as the Court may prescribe, which guarantees at least a 10 per cent net increase over the price specified in such published offer.

Super.Ct.Civ.R. 308(c)(4).

2. *Lynn v. Lynn, et al.,* No. 88–1628 (D.C.C.A. July 17, 1989).

3. For convenience, the parties will be referred to as appellant and appellees.

4. According to appellant's testimony, he is a member of the Bar of Maryland. The time within which the answer was to be filed had been extended by the court until August 15, 1988.

5. Appellees' response to the motion asserts that one of them filed a prior complaint against appellant in a separate case which he voluntarily dismissed under Super.Ct.Civ.R. 41(a).

6. Appellant wrote two letters to Judge Stephen Eilperin dated November 4, 1988 and November 17, 1988 asserting that James Lynn was indebted to him for in excess of $200,000 arising out of other claims and for James Lynn's default on matters associated with the property.

7. The properties ordered to be sold included 1216 Independence Avenue, S.E. and Units G–3 and G–4 at 115 D Street, S.E. The order recites that each of the three parties own an undivided one-third interest in each unit on D Street, while appellee, James Lynn, and appellant, Peter Lynn, own an undivided one-half interest in the Independence Avenue property.

held before entry of the order for partial summary judgment.[8] Appellant noted his first appeal from that order on December 29, 1988.[9] This court dismissed the appeal on July 17, 1989 because of appellant's failure to designate the record in compliance with a prior order of the court.[10]

Pursuant to the order of partial summary judgment, three separate hearings were held to confirm contracts submitted and published in accordance with Rule 308(c). On September 14, 1989, an order was entered finally ratifying the sale of 115 D Street, S.E., Unit G–3, and on May 30, 1989 after a hearing, the court confirmed the sale of Unit G–4 in the same building. No appeal was taken from these orders.

On November 14, 1989, a hearing was held before Judge William Gardner on the trustee's motion for entry of an order nisi to sell the Independence Avenue property. Prior to that time, appellant had submitted to the trustee a written contract containing a higher offer to purchase the property, which he requested the trustee to publish.[11] After a hearing, the court entered the order nisi providing for publication of the original offerors' contract. Following publication of the terms of that contract, a hearing was held before Judge Rufus King on November 27, 1989 to consider any increased offers. *See* Super.Ct.Civ.R.

308(c)(4). Appellant offered to purchase the property at an amount which would net in excess of 10% above the published contract offer, the amount of the bid required to upset the published offer. *See id.* Appellant testified at an evidentiary hearing during the Nisi proceedings, and the court determined that appellant's offer was not a bona fide one as required by the rule. *See id.* Therefore, on November 27, 1989, Judge King entered an order finally ratifying the sale of 1216 Independence Avenue, S.E. to the original offerors.[12] Appellant noted an appeal from that order on December 26, 1989.

II

The Nisi Hearing

The published offer for the Independence Avenue property was for a total purchase price of $212,000. The original offerors paid a cash deposit of $5,000, and their contract provided for an additional $5,600 to be paid at settlement to complete the down payment. Their contract was contingent upon the purchasers securing a commitment for financing the $201,400 balance within forty-five calendar days of ratification of the contract, and the purchasers agreed to make application and file documents for processing the loan within seven days. The offerors attached to their con-

8. After the grant of summary judgment, appellant wrote a letter to Judge Burgess which Judge Burgess transmitted to Judge Taylor. Judge Taylor filed the letter in the jacket and treated it as a motion for reconsideration. On January 12, 1988, Judge George Mitchell denied the motion for reconsideration, concluding that even if appellant had complied with all procedural requirements, he offered no facts indicating that material facts were in dispute which precluded the grant of partial summary judgment.

9. The record reflects that the order was signed out of the presence of the parties on November 22, 1988 and docketed on November 30, 1988. Thus, the prior appeal was noted timely on December 29, 1988. *See* D.C.App.R. 4(a)(1) and (a)(3) (time for noting an appeal in civil case begins to run from date of entry of the judgment or order on the civil docket with additional five days allowed under D.C.App.R. 4(a)(3) when order entered outside presence of the parties and counsel); *see also Singer v. Singer,* 583 A.2d 689 (D.C.1990) (treating as two separate time periods the thirty days allowed under

D.C.App.R. 4(a)(1) and five days under D.C.App.R. 4(a)(3), effectively extending date of entry of order on the docket by five days, excluding Saturdays, Sundays and holidays pursuant to D.C.App.R. 26(a)).

10. Although the order of dismissal does not specify the grounds upon which it is based, the order was entered following appellees' motion to dismiss the appeal on the grounds that appellant had failed to file the designation of record as previously ordered by the court.

11. Although appellant's contract was $3,000 higher than that of the original offerors, it contained a financing contingency, and standard language requiring the purchaser to make application for financing immediately was deleted. Appellant's contract also provided for a credit to appellant of $60,000 in consideration of his ownership interest in the property.

12. Appellant has informed this court, and appellees do not dispute, that the original offer has been withdrawn.

tract a letter from Mortgage Investment Corporation indicating that they had made an application for a loan for the transaction and that they appeared to qualify based on the information which they submitted. The letter also indicated that it was not a loan commitment and that approval of the loan was subject to verification, additional documentation, a credit report and appraisal.

At the hearing scheduled to consider the original offerors' contract and to entertain higher offers pursuant to the order nisi, appellant offered $233,211 for the property. Appellant initially offered to make a down payment of $63,200, of which a deposit of $5,000 would be a part, with the balance to be obtained through financing of $110,000 and a credit given for his 50% ownership interest in the property at $60,000. However, appellant stated repeatedly that if his request for a credit for his interest were cause for denial of his bid, he would raise his offer by a higher cash payment.[13] Appellant also provided a statement from a lending institution indicating that he had made an application for a loan and that he qualified for a loan commitment of $110,-000 based on the financial information he had provided. Like the statement provided by the original offerors, appellant's potential lender's statement also reflected that it was not a loan commitment and that it was subject to a satisfactory appraisal and credit report. At the hearing, the court asked for bids in excess of $233,200, but there were no higher offers made. Counsel for appellee, James Lynn, informed the court that appellant would not be able to obtain financing for the purchase based on representations appellant made in a pleading filed earlier concerning his financial condition. The court attempted unsuccessfully to ascertain the amount appellant might derive from his 50% interest in the property.[14] Appellees' counsel represented that if appellant could prove that he could come

up with the cash, he would have no objection to the sale to appellant.

Appellant first represented, and subsequently testified, that he had been self-employed since 1977 and that he was a member in good standing of the Maryland Bar, doing some consulting and conducting a small real estate business. Appellant offered to bear the cost of any delay if his offer to purchase were not completed, including posting a bond. Thereafter, appellant was called as a witness in his own behalf.

In response to questioning by the court, appellant testified that he had cash on deposit in two banks totalling between $113,-000 and $123,000. He reported a capital gain of $70,000 for 1988. Appellant testified that he had real estate tax losses of roughly $10,000 for 1988. When the court inquired of appellant if he had received any W–2 or 1099 tax forms, he responded that he had not. For the three months preceding the hearing, appellant testified that his income, not considering the properties in dispute, was $4,000. Appellant also indicated that for tax purposes he expected to show tax losses as a result of this law suit, depreciation and returns on other real estate. Although appellant testified he had consulting work in the last sixty days, he said he had had no such work in the last thirty days. However, appellant offered to provide a creditor's financial statement under oath to demonstrate that he had sufficient cash backing for the contract. He testified that he owned other real estate and that the lender was willing to finance the purchase, apparently on that basis. He also testified that it would be standard practice for a financing company to provide the loan with such a large down payment on what appellant thought was significantly undervalued property.[15] The net earned income which appellant reported of $48,000 to $50,000 for 1988 was for a sale of his

---

**13.** The original offerors' contract provided for a broker's commission of 6%. Assuming that a broker's commission were payable on appellant's bid, there is no dispute that the bid would yield an amount more than 10% above the original offer.

**14.** Each party's entitlement to the proceeds of sale is subject to increase or reduction based on the accounting for rents, expenses and profits, which remains to be resolved.

**15.** Three appraisers appointed by the court appraised the Independence Avenue property at $245,000, $230,000 and $236,000, respectively.

residence. He also said that he had several "small credit cards." Appellant was reluctant to disclose further information about his consulting clients and financial circumstances to appellees at the hearing.

The motions judge found that since appellant had no W–2's or 1099's, he had "no formal employee or contract income, contract of employment income." The court observed that appellant's gross income for 1988 was referable to the proceeds of sale of real estate. The court considered appellant's $10,000 loss reported in 1988, his unquantified, anticipated real estate losses for the preceding three months, and appellant's report of only "slight consulting" business in the last sixty days. Based on these findings, the court concluded as follows:

> It is the Court's general recollection that the service a $110,000 mortgage would require at least $1200 a month mortgage payment, and probably somewhat more in terms of the—insurance requirements. And a—this would require a regular gross income of something on the order of 3500 to $4,000 per month, and there just is simply no indication of anything like that in this case. So I have to conclude that the offer at a higher price is not a bona fide one and should not displace the offer which appears—which is subject to the order nisi which appears on its face—accepted.

### III

■ First, appellant argues that the trial court erred in ordering a private sale of the real property involved in this action without first holding a hearing as required by Super.Ct.Civ.R. 308(c)(1). The order for private sale of the property was a provision of the court's order granting partial summary judgment in favor of appellees. That order was entered without a hearing.[16] Appellant previously filed a timely appeal from the order granting partial summary judgment (appeal no. 88–1628). This court dismissed the appeal because of appellant's failure to comply with an order to designate the record. We conclude that dismissal of the appeal made final the order for partial summary judgment and barred further litigation challenging the validity of the order. *See In re Parsons,* 328 A.2d 383, 385 (D.C.1974), *cert. denied,* 423 U.S. 803, 96 S.Ct. 11, 46 L.Ed.2d 24 (1975); *see also United States v. Heasley,* 283 F.2d 422, 427 (8th Cir.1960).

Appellant makes the argument that dismissal of the earlier appeal has no issue preclusion effect for two reasons: (1) the prior order was not appealable and, (2) the prior appeal was dismissed on procedural grounds. If the order were not appealable as appellant contends, then this court lacked jurisdiction to consider the prior appeal, and the case would be in the same posture after dismissal as it would have been if no appeal had been noted. Therefore, we turn first to the appealability issue raised by appellant.

■ Generally, orders which do not dispose of the entire case are unappealable. *Urciolo v. Urciolo,* 449 A.2d 287, 289 (D.C. 1982); *Dameron v. Capitol House Assoc., Ltd.,* 431 A.2d 580, 585 (D.C.1981). There are exceptions, one of which is applicable in this case. The order involved here is covered by D.C.Code § 11–721(a)(2)(C) (1989) which lodges jurisdiction in this court for appeals from orders of the Superior Court "changing or affecting the possession of real property." We have held that an order appointing a trustee to sell real proper-

---

**16.** The court has discretion to decide a motion for summary judgment filed pursuant to Super.Ct.Civ.R. 56 without a hearing. *Pagan v. Horton,* 464 A.2d 146, 148 (D.C.1983); see Super.Ct.Civ.R. 12–I(f), formerly Super.Ct.Civ.R. 12–I(i). However, Super.Ct.Civ.R. 308(c) governs the procedure for obtaining an order for private sale of real property pursuant to court order. The pertinent portion of the rule reads as follows:

(1) Order for. A private sale may be ordered after a hearing of which notice to all interested parties is given by publication or otherwise as the Court may direct, if the Court finds the best interests of the estate will be conserved thereby.

Since we conclude that appellant is precluded from challenging again the court's order for partial summary judgment, we do not reach appellant's claim that the court erred in entering the order prior to holding the hearing prescribed by Rule 308(c).

ty in accordance with Super.Ct.Civ.R. 308(c) is an appealable order under the terms of this statute. *Robinson v. Evans,* 554 A.2d 332, 335 n. 11 (D.C.1989). The terms of the partial summary judgment order in this case bring it within the statutory provision. The order transferred possession of the property from its owners and placed it under the control of a trustee to manage, to collect the rents and profits, and to sell. Thus, the order is one which changed the possession of the property within the meaning of D.C.Code § 11–721(a)(2)(C) (1989). *See Robinson, supra.* Moreover, the order finally resolved the nature and extent of each party's interest in the property. As to appellant, it finally disposed of his claim that the properties were owned by his business in which appellees were only investors, as opposed to outright co-owners of each parcel of real property. Therefore, we conclude preliminarily that the court's order docketed on November 30, 1988 was an appealable order. *See Robinson,* 554 A.2d at 335 n. 11.

Appellant noted a timely appeal from that order. See note 9, *supra.* When that appeal was dismissed because of appellant's failure to designate the record, that dismissal finally concluded appellant's right to challenge the order subsequently, and the judgment became final as to appellant upon disposition of the appeal. It is the "law of the case" principle which precludes reopening questions resolved by an earlier appeal in the same case. *See Kleinbart v. United States,* 604 A.2d 861, 866 (D.C. 1992); *see also Lehrman v. Gulf Oil Corporation,* 500 F.2d 659, 662–63 (5th Cir. 1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). Under that doctrine, "appellate courts generally adhere to a ruling made on a prior … appeal." *Kleinbart,* 604 A.2d at 866. The general rule is that "if the issues were

decided, either expressly or by necessary implication, those determinations of law will be binding on remand and on a subsequent appeal." *Lehrman,* 500 F.2d at 663 (citations omitted). Dismissal of the earlier appeal was a final disposition of it, which operates as a bar to appellant raising the same issues between the same parties again in this court. *Parsons, supra,* 328 A.2d at 384–85 (dismissal of appeal for lack of prosecution made final the order appealed from).

Appellant argues that *Parsons* supports his position that an order authorizing a private sale of real property is not an appealable one and, therefore, the court has no jurisdiction over the prior appeal. Thus, appellant argues the "law of the case" principle does not apply. *Parsons* is distinguishable from this case on the question of the appealability of the order for partial summary judgment. A review of the facts in *Parsons* is essential to understanding the distinguishing features. In *Parsons,* during administration of a conservatorship, the conservator sought to enter negotiations to sell his ward's one-half interest in real property when the trustee for the co-owner said he intended to sell or seek partition.[17] The trial court held a hearing to consider any objections by the ward's nephew who had sought unsuccessfully to be appointed conservator. The nephew objected to the court's determination that the ward's best interest would be served by a sale of her interest and by authorization for the conservator to proceed with a private sale of that interest.[18] *See* D.C.Code § 21–148 (1981) (applicable to conservatorship proceedings under D.C.Code § 21–1503 (1981)). The nephew noted an appeal. This court determined that the order appealed from was not final because it was simply "an order authorizing negotiations for a private sale." *Parsons, supra,* 328

---

17. Under the law then in effect, a duly appointed and qualified conservator of the estate of a ward had control of the real and personal property of the ward, subject to the supervision of the court. D.C.Code § 21–1503 (1981). At that time, the powers of the conservator with respect to the ward's property were the same as those of guardians for the estates of infants under prior law. D.C.Code § 21–1503 (1981). The requirement for a court order for sale of the ward's

property then applicable is found in D.C.Code § 21–143 (1989).

18. Such hearings are scheduled to consider objections by interested parties who are given notice, pursuant to Super.Ct.Civ.R. 308(c). Interested parties include the ward's nearest known heirs-at-law or next-of-kin. *See* Super.Ct.Civ.R. 310(a)(4).

A.2d at 384. That is a critical difference between *Parsons* and this case.

In addition, the order authorizing negotiations for a sale in *Parsons* involved no transfer of possession of the property from its owner to another as the order in this case does. In *Parsons*, the conservator was already in possession and control of the ward's property, subject to the jurisdiction of the court, pursuant to his statutory powers. *See* D.C.Code §§ 21–143, –1503 (1981). The nephew who objected, unlike appellant, had no ownership interest which entitled him to possession and other rights incident thereto. In this case, it was the order granting partial summary judgment which decided the rights of ownership among the parties and effected a transfer of possession of the property from appellant to a trustee with specific powers, including the power to sell.[19] This brings the order squarely within the provision of D.C.Code § 11–721(a)(2)(C), which provides that such interlocutory orders are appealable. *See Robinson, supra,* 554 A.2d at 334; *see also Hagner Management Corp. v. Lawson,* 534 A.2d 343, 345 (D.C.1987).

 Even though the "law of the case" doctrine generally precludes reexamination of the issues raised in a prior appeal, under exceptional circumstances, the court will revisit an issue. *See Kleinbart, supra,* 604 A.2d at 866–67. Such circumstances include that: " 'the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.' " *United States v. Turtle Mountain Band of Chippewa Indians,* 612 F.2d 517, 521, 222 Ct.Cl. 1 (1979) (quoting *White v. Murtha,* 377 F.2d 428, 431 (5th Cir. 1967)); *see also Kleinbart, supra,* 604 A.2d at 867 (where previous ruling not suffi-

ciently final or clearly erroneous in light of change in substantive law or newly presented facts, doctrine will not be applied). A second review is not precluded if required to meet the goal of doing substantial justice. *Lehrman, supra,* 500 F.2d at 663. We need not consider whether such exceptional circumstances are present here because a jurisdictional bar forecloses our review of the partial summary judgment order and the two orders finally ratifying the sales of Units G–3 and G–4 at 115 D Street, S.E., entered on September 14, 1989 and May 30, 1989, respectively. Appellant failed to note a separate appeal from any of the three orders. Our appellate rules require that notice of appeal be filed within thirty days after entry of the judgment or order from which the appeal is taken unless otherwise provided by statute. D.C.App.R. 4(a)(1). Since appellant did not note any further appeal from the order granting partial summary judgment and the orders for sale of the D Street units, we are precluded from considering appellant's challenges to them. *See In re E.G.C.,* 373 A.2d 903, 905 (D.C.1977). Failure to note an appeal from an order within the time provided in the rule is jurisdictional. *Frain v. District of Columbia,* 572 A.2d 447, 449 (D.C.1990); *In re C.I.T. & C.M.T.,* 369 A.2d 171, 172 (D.C.1977); *Farmer, supra,* 526 A.2d at 1371. Therefore, the only issue properly before the court on appeal is whether the trial court abused its discretion in rejecting appellant's offer to purchase the Independence Avenue property at the nisi hearing. We turn to that issue.

IV

Appellant argues that the trial court erred in finding that the offer he made at the nisi hearing was not a bona fide one. *See* Super.Ct.Civ.R. 308(c)(4). We review for abuse of discretion. The court is obli-

---

**19.** *In Farmer v. Farmer,* 526 A.2d 1365 (D.C. 1987), a footnote appears citing *Parsons* for the proposition that there is no appealable order when the court merely authorizes appointment of a third party to arrange a sale subject to court approval. 526 A.2d at 1368 n. 3. The issue addressed in *Farmer* for which the reference to *Parsons* is made was whether the Family Division of Superior Court had jurisdiction to approve the sale. *Id.* at 1368. The portion of

the note pertinent to the disposition of the issue in *Farmer* was that jurisdictional questions could be raised for the first time on appeal. *Id.* at n. 3. Therefore, we do not view that reference in *Farmer* to be controlling here. On the facts of this case, the appealability of the order is controlled by statute, D.C.Code § 11–721(a)(2)(C) (1989). *See Robinson, supra,* 554 A.2d at 335.

gated to secure for the owners of the property the "largest practicable returns." *Heller v. Lamar,* 64 App.D.C. 266, 268, 77 F.2d 389, 390 (1935); *see also Farmer, supra,* 526 A.2d at 1371. The court also has a duty to reject the original offer if a bona fide offer is made in an amount which will increase the net to the sellers by 10%. Super.Ct.Civ.R. 308(c)(4). We conclude that the trial court failed to meet these requirements because some of its findings were based upon evidence not properly before the court and because it failed to consider imposing conditions which would protect the interest of the parties while securing for them the largest return.

■■■■ The trial court's determination that appellant's offer was not a bona fide one was based on facts not in evidence. The court concluded that appellant could not qualify for a loan of $110,000 in spite of a statement from a lending institution that he so qualified. This finding was premised in part upon the court's apparent personal knowledge of what would be required to service the loan and what the lender would require to grant it. The court made an assumption that the payment would be at least $1,200 per month and that the lender would require appellant to have an income of $3,500 to $4,000 per month to make the loan.[20] Thus, the trial court substituted for evidence facts which it claimed to know as a personal observer, and "a trial judge is prohibited from relying on his personal experience to support the taking of judicial notice." *United*

States v. Lewis, 833 F.2d 1380, 1385 (9th Cir.1987).[21] At the same time, the trial court rejected without explanation the uncontradicted evidence that the standard practice for a financing company is to provide a loan where such a large down payment ($110,000) is made on property, which, in the owner's opinion, is significantly undervalued. While a trial court may disregard the testimony of a witness even absent directly conflicting testimony, *Barlow v. Cornwell,* 125 A.2d 63, 67 (D.C. 1956), it cannot treat the evidence arbitrarily. *Riedl v. Riedl,* 153 A.2d 639, 641 (D.C. 1959). That appears to be the case here. There was no inconsistency in this particular aspect of appellant's testimony, and appellees did not challenge the evidence. The court's rejection of the evidence and substitution of its own personal knowledge were clearly erroneous.

The trial court also seems to have confused appellant's losses for income tax purposes with real losses. The court's conclusion that the failure to receive W-2's and 1099's means that appellant had no assets or prospects of income likewise appears to be based improperly on the court's personal knowledge, rather than on the evidence. Whether such income reporting forms are required for every type of income was not before the court. Again, we conclude that the court improperly relied upon matters of its own personal knowledge, *see Lewis,* 833 F.2d at 1385, and rejected all the unrebutted evidence presented by appellant as to his income and assets.[22] In these respects,

**20.** No doubt, a lender would also consider the value of the borrower's assets in determining his or her credit worthiness. The extent to which the lender would do so is not a matter so readily determinable with certainty or so well known that it can be judicially noticed any more than the fact which the court assumed or noticed here. *See Poulnot v. District of Columbia,* 608 A.2d 134, 141–42 (D.C.1992).

**21.** *Cf. Poulnot, supra* note 20, 608 A.2d at 141–42 (facts may be judicially noticed when "'well known by all reasonably intelligent people in the community'" or "'easily determinable with certainty from unimpeachable sources'" (quoting *Harper v. Killion,* 345 S.W.2d 309, 311 (Tex. Civ.App.) *aff'd,* 162 Tex. 481, 348 S.W.2d 521 (1961)).

**22.** Instead of relying upon the testimony presented at the nisi hearing, our dissenting col-

league relies, in part, upon information extracted from the record of earlier proceedings in the case. The trial court did not base its findings on that information as shown by the judge's oral decision, which is reproduced in its entirety in the dissenting opinion. *See* post at 20–21. Rather, the trial court focused on whether appellant could obtain financing. Even assuming the court properly could consider as evidence matters outside the hearing, there was also information in the court's record showing that appellant had sources of substantial assets. For example, appellant had received the proceeds of sale of two other parcels of real property as a result of this case, and appellant had sold his residence and received a substantial sum for it. Such factors would undercut the conclusion posited by our dissenting colleague that there was an adequate basis for the trial court to

the trial court's decision was based upon improper evidence and faulty premises which resulted in clearly erroneous findings.

■ The trial court also rejected appellant's higher offer without considering imposing conditions proposed by appellant to assure his completion of the transaction and to protect appellee from damages in the event appellant failed to do so.[23] Appellant offered to post a bond or other security for his performance of the contract, and the court did not explore or consider such conditions. The rule governing the court's role in the private sale allows it to prescribe conditions for the sale. *See* Super.Ct.Civ.R. 308(c)(4). In addition to the conditions proposed by appellant, the court had authority under the rule to prescribe a broad range of conditions to assure appellant's performance and protection for the parties' interests while securing the highest obtainable price. For example, the court could have prescribed the time period within which settlement had to occur and the time period within which the loan commitment had to be obtained or a contractual financing contingency had to be removed. The court also rejected appellant's proffer of a pre-purchase financial statement. Given the trial court's obligation to secure for the sellers the greatest return practicable, *see Heller, supra,* 64 App.D.C. at 268, 77 F.2d at 390, and its authority to specify conditions to protect the sellers under Super.Ct.Civ.R. 308(c)(4), its failure to consider imposing conditions, given appellant's higher offer, was an abuse of discretion.

## V

Therefore, we remand the case with instructions to the trial court to consider appellant's offer, evidence of his present ability to consummate the sale and "such conditions as the court may prescribe" to assure protection of the sellers. In the event further proceedings do not result in confirmation of a sale to appellant, the court is instructed to require the trustee to comply with the provisions of Rule 308(c) with respect to any new offer.[24]

*Reversed and Remanded with instructions.*

SCHWELB, Associate Judge, dissenting:

I am unable to agree with my colleagues that the trial judge made clearly erroneous findings, or that he abused his discretion, when he concluded that Peter Lynn's offer to purchase the Independence Avenue property was not a "bona fide" offer. In my opinion, the judge's findings had ample support in the record, and no abuse of discretion was shown.

## I

It is important to place the judge's decision in its proper context. The complaint in this case, which pits a father in his seventies and one of his sons against a second son in unrelenting and rhetorically unrestrained combat, was filed in March 1988. The appellees, James and Jeffrey Lynn, urged during the course of the bewilderingly complex proceedings in the trial court that the properties in question be sold swiftly. They contended that any delay

conclude that appellant could not provide the downpayment.

**23.** A bidder at a nisi hearing is not expected to arrive with a loan commitment at the time of the bid. Except for the original offeror, potential bidders generally learn of the offer of sale only ten days before it occurs. *See* D.C.Super.Ct.Civ.R. 308(c)(4). The final terms of the contract of sale, including the price, are not set until after the bidding is concluded. *See id.* Thus, arrangements for a loan commitment consistent with the contract cannot be made until the contract is signed and approved by the court. Therefore, the fact that appellant had no commitment is given too much weight by our dissenting colleague, if not considered improp-

erly. On the other hand, the original offerors had at least a signed contract, contingent on court approval. Yet, even they did not provide a loan commitment. The original bidders, about whom the court knew nothing and from whom it sought no financial information even though they promised almost no cash, were on an equal footing with appellant insofar as the letter from the lender indicating conditional approval for the loan was concerned. In addition, appellant already had an undivided 50% interest in the property, subject to an accounting with the co-owner.

**24.** We do not intend by this order to foreclose the parties from selling the property pursuant to any valid settlement agreement.

threatened them with financial ruin because they were being required to make the mortgage payments but were not receiving the income.

On November 15, 1989, Judge William C. Gardner issued an Order Nisi with respect to the Independence Avenue property. The Order provided that a proposed sale to third party offerors would be approved on November 27, 1989 unless at that time there were brought to the attention of the court any "bona fide offers which guarantee at least a ten percent (10%) net increase over the price specified" by the offerors.

At the November 27 hearing, Peter Lynn made an offer which, on its face, provided for a higher purchase price and for a larger down payment than the offer made by the third parties. The issue before the trial judge was whether this offer was a "bona fide" offer.

The judge's oral decision, in its entirety, was as follows:

THE COURT: All right.

Of course, I again remind you I'm not sitting as an appellate court to review Judge Gardner's order nisi, simply to determine whether there is a formal— whether there is a bona fide offer that exceeds the proposed contract by 10 percent. And I find that the offer does not meet that criteri[on].

The circumstances are that the defendant has proposed a sale price at $233,-200, which in terms of just the gross number does represent a 10 percent increase, a greater than 10 percent increase; however, the offer contains in it a financing provision for a $110,000 mortgage, and the—in the Court's experience, notwithstanding a letter from a bank which says that based on their attached motion, it says, "A loan for $110,-000 would be—that the defendant, Peter Lynn, would meet that qualification based on the financial information provided. However, please note that this is not a loan commitment and is subject [to] all verifications and so on."

When asked to testify under oath as to his income, the testimony has been to the effect that—and if I understood it correctly—there's no W-2s or 1099s, which means no formal employee or contract income, contract of employment income. Instead, the Defendant has been self-employed, but he testified first that he had a negative income for the last three months, and then talked about whether ... he was including the proceeds of the houses and so on.

In talking about the gross income for 1988, he again referred to gross proceeds or proceeds from sale of real estate as largely determining whether or not his forty or fifty thousand dollar gross would apply.

And on the other side has been the testimony that there was a loss in 1989— or 1988, for $10,000, and a loss in the last three months which the defendant was unable to quantify; and testimony that he had done very slight consulting in the last 60 days and none within the last 30 days.

It is the court's general recollection that the service a $110,000 mortgage would require at least $1200 a month mortgage payment, and probably somewhat more in terms of the insurance requirements. And this would require a regular gross income of something on the order of $3500 or $4,000 per month, and there just is simply no indication of anything like that in this case. So I have to conclude that the offer at a higher price is not a bona fide one and should not displace the offer which appears— which is subject to the order nisi which appears on its face—accepted.

I would note that I've gone at some pains to be sure that you were not unnecessarily or [lightly] requiring a sale to the exclusion of an offer by one of the co-tenants, but am satisfied on this record that that is required by these circumstances and that the offer is not likely to result and would instead result in unnecessarily delays, probably loss of this contract and indefinite delay [of the] other contract.

So in those circumstances, I will sign the order ratifying the sale.

The principal question before us is whether this decision was supported by the

record. If the judge's factual findings were sound, it is difficult to argue that he abused his discretion in some other way.

## II

Peter Lynn claimed at the hearing that he was in a position to purchase the subject property for $233,211. Although he represented that he was ready to make a large down payment, he acknowledged that he would nevertheless need a $110,000 mortgage loan for the balance. He had no commitment for such a loan, and the proffered statement from a lending institution that he was qualified to borrow the necessary amount was conditioned on the accuracy of the information provided by Peter Lynn to the lender.[1] The judge, as we shall see, had good reason to doubt the accuracy of any such information.[2]

Peter Lynn's *pro se* answer to the complaint in this case provides a useful starting point for our inquiry. In that pleading, Peter Lynn did not depict himself as an individual who could readily qualify for a $110,000 loan. Rather, he represented to the court that

> [t]he defendant Peter Lynn is very poor. His annual income for federal income tax purposes has been negative for a number of years. He has lived below normal American standards "camped" out in various reconstruction projects which lack normal heating or plumbing in order to economize for the sake of business success.

Answer, para. 3. Peter Lynn further alleged that his father, or others in league with his father, had interfered with various of his (Peter Lynn's) activities and assets. Peter Lynn claimed that this "indirect personal entanglement ... was accompanied by an increasingly dense illicit surveillance and communications system around the defendant".... *Id.*, para. 6–7. These nefarious activities,[3] according to Peter Lynn, "impacted adversely upon [his] employability and upon his income level," and compelled him "to liquidate capital to sustain the business."

By the time Judge King was called upon to assess the *bona fides* of Peter Lynn's offer, it had already been established in this litigation that, evidently as a result of the poverty of which Peter Lynn complained in his pleading, Peter Lynn was an unreliable credit risk. On November 22, 1988, in her order granting partial summary judgment to James and Jeffrey Lynn, Judge Harriett Taylor stated that "beginning no later than March of 1987, defendant Peter J. Lynn stopped making the monthly mortgage payments of $833.07 per month on Parcel I." She further found that "Peter J. Lynn allowed the tax bills on the property to go unpaid."[4] Peter Lynn complained that he had received no notice of the motion for partial summary judgment and that Judge Taylor's order was erroneous. On January 11, 1989, however, Judge George Mitchell denied Peter Lynn's request for reconsideration,[5] holding that

---

1. The third party offeror's statement was similarly conditioned.

2. Peter Lynn testified that "the financing company, I believe, is relying on about 4,000 [dollars] over a period of three months." [Tr. 36] Although this amount—which would represent an income of $16,000 a year—is not very large for one who seeks a loan in almost seven times that amount, Peter Lynn provided no evidence that he had earned or would earn even this modest income.

3. Peter Lynn's father was not the only individual whom the son accused of plotting against him. At the conclusion of the hearing, Peter Lynn told the judge that "I believe you have made a consciously wrongful decision." He added that *"I regret the participation of the court in a conscious fraud at the lower level."* In spite

of Peter Lynn's testimony that he is a member of the Maryland bar, the judge chose to overlook these remarks. Earlier in the case, Peter Lynn intimated that at least one of the trial judges had engaged in wrongdoing against him. He also asserted that all of his pleadings and documents had mysteriously vanished from the case file. [R. 368]

4. Judge Taylor also concluded that "[b]ecause the defendant Peter J. Lynn is failing in his duty to apply the rental proceeds to the expense of maintaining the properties, a hardship is being imposed on the plaintiff James A. Lynn."

5. Although Peter Lynn is an attorney, he generally eschewed pleadings and sought reconsideration instead by writing a series of letters to various judges of the Superior Court. According to counsel for appellees, copies of these letters were never served on him.

even if the defendant had complied with all procedural and substantive requirements regarding summary judgment motions, he has presented nothing which would or could create a disputed issue of material fact on the limited issues resolved by the partial summary judgment order.

Given this history, the trustee appointed to sell the property, as well as counsel for James and Jeffrey Lynn, were understandably dubious about Peter Lynn's ability to obtain the loan that he would need in order to live up to his offer.[6] A review of the transcript of the November 27, 1989 hearing reflects that the trial judge listened conscientiously and attentively to Peter Lynn's representations, as well as to the concerns of the trustee and of the appellees. After the parties had articulated their positions, however, the judge stated that he was "concerned about the possibility of losing a sale and then finding out that you can't produce." In order to assess this danger and to assure that there was an appropriate evidentiary record, the judge placed Peter Lynn under oath. The main question addressed by the judge and by counsel for appellees in examining Peter Lynn was whether the witness had the means to obtain a $110,000 mortgage. The inquiry therefore focused upon Peter Lynn's past and anticipated earnings.

Peter Lynn claimed to have earning potential as a lawyer, as a consultant, and through his "real estate business." His testimony with respect to each of these activities, however, was less than reassuring. As to his legal practice, he testified as follows:

Q: Have you derived, during the calendar year 1989, any income from practicing law?

A: No.

With respect to his consulting business, his answers were not significantly more encouraging; he acknowledged that any amounts earned were "quite small."[7] Peter Lynn also claimed to have a "small real estate business" which he carried on "as an avocation." He testified, however, that his income from this business for the past three months "would be negative; I mean it would be very negative." All in all, Peter Lynn reported a tax loss of $10,000 for 1988. He also stated that he did not own an automobile.

To be sure, Peter Lynn also claimed that he had bank accounts totalling at least $113,000,[8] and he assured the judge that he would post a bond and take various other measures to protect his father and brother from any loss which they might suffer if he was unable to obtain prompt financing. It was reasonable for the trial judge, however, to consider these representations in

---

6. Counsel for appellees made it clear that if Peter Lynn could in fact purchase the property at the higher price, this would be in his client's interest, and thus altogether acceptable.

7. Q: You have stated that you were—you've got a source of income from consulting; is that correct?

A: That is sometimes perhaps correct.

Q: And you can tell us whether you consulted within the last 30 days?

A: No.

Q: Did you consult within the last 60 days?

A: I have periodically consulted.

Q: Within the last 60 days? If you can remember.

A: Well, I think there was some slight thing done.

Q: Who did you consult for, sir?

THE WITNESS: Your Honor, I think that this is irrelevant and goes way beyond the limits.

THE COURT: Overruled.

BY MR. PALEOS (counsel for appellees):

Q: Who, sir, did you consult for?

A: Well, several people asked me for information on legal problems. They were all very small consultations.

Q: Who are these people?

A: Well I would have to consult a list.

Q: So you don't recall? Is that what your testimony is?

A: That's correct.

Q: Can you tell us how much you earned from these legal consultations, say in the last six months?

A: Well, I don't know. The amounts for that haven't been figured. They are quite small.

8. Even as to this, Peter Lynn provided no documentation and his testimony was disconcertingly imprecise:

"Well, my bank accounts with Crestar—I don't know—I don't have the exact figure—are between 60 and 70 thousand dollars; and with Citibank, about 53 thousand dollars."

Peter Lynn explained that "I'm sorry, I didn't come prepared to answer in detail all of these questions."

light of the history of the litigation, Peter Lynn's claim of abject poverty, his failure to make other mortgage payments, and the wild accusations which he had leveled in various directions. The judge could surely view it as most unusual that an individual who described himself as "very poor" claimed the ability to pay so much more for the property than anyone else had offered to pay. Moreover, this court is confined to a printed record—a "dehydrated peach," as this court recently called it, *see Stewart v. District of Columbia Dep't of Employment Servs.*, 606 A.2d 1350, 1352, n. 5 (D.C.1992) (citation omitted)—and the trial judge was in a far better position than we are to appraise Peter Lynn's demeanor and credibility. Finally, time was of the essence, and the judge was quite reasonably concerned about the possible loss of an offer which the trustee apparently regarded as being almost a "bird in the hand." [9]

Judge Gardner's Order Nisi essentially provided that the sale to the third party offeror would be approved unless a significantly superior *bona fide* offer was tendered. Appellees contend, and I agree, that Peter Lynn had the burden to show, by a preponderance of the evidence, that his was such a *bona fide* offer. In concluding that Peter Lynn had not made the requisite showing, the trial judge obviously declined to credit Peter Lynn's representations as to what he would be able to afford. It is not the province of an appellate court to second-guess credibility determinations by a trier of fact who has heard the testimony. *In re S.G.*, 581 A.2d 771, 774–75 (D.C.1990). Indeed, the scope of our review of such a factual determination is restricted by statute; we must sustain it unless it is "plainly wrong or without evidence to support it." *See* D.C.Code § 17–305 (1989).

I agree with the majority that the judge could not properly take judicial notice of the size of the monthly payment that he thought Peter Lynn would have to make, or of the amount of monthly income that he would be required to earn, in order to obtain approval of the mortgage loan. Assuming that the judge privately knew that the figures he hypothesized were accurate, "actual private knowledge by the judge is no sufficient ground for taking judicial notice of a fact as a basis for a finding or a final judgment." *Poulnot v. District of Columbia*, 608 A.2d 134, 142 (D.C.1992) (quoting 2 JOHN W. STRONG, MCCORMICK ON EVIDENCE, § 329 at 390 (4th ed.1992)).

In my opinion, however, the majority makes too much of this issue. Even though the judge could not properly assume, without proof, the precise monthly income which would qualify Peter Lynn for the loan, or the exact monthly payment which he would have to make, he could legitimately take judicial notice of the fact that a borrower would ordinarily need a significant income and that the monthly payment would be substantial.[10] "When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men or women." *Poulnot, supra*, 608 A.2d at 141 (citations and internal quotation marks omitted). It does not take specialized expertise to know that one who is "very poor," who lives with substandard heating and plumbing, who does not own an automobile, who lacks regular employment, and who has been found to have failed to make mortgage payments on other properties, is

---

9. Counsel for James and Jeffrey Lynn summarized for the trial judge the reasons for moving with dispatch:

 If he is prepared, Your Honor, to prove to the court today that he can come up with this cash, we would have no objection. But the sad fact is that this is another in a long line of delaying, stalling tactics which is costing the estate a tremendous amount of money. If this sale falls through, we are gong to go through the winter with this property unrented, and it is going to net the estate a large loss. And I don't think Mr. Lynn, unem-

ployed as he is, can actually make good on that loss. And if he is ever going to come out with anything in this case, it's to get these properties—this particular property quickly and efficiently sold.

10. Perhaps a hypothetical person rich in assets could qualify for such a loan even without any appreciable current income. Given, among other things, Peter Lynn's prior default on his mortgage payments, however, the judge could reasonably find that Peter Lynn was not such a person.

a questionable candidate for a substantial mortgage loan.

The basic theme of the judge's decision was that negligible income, poor credit performance, and general financial plight would probably disqualify someone in Peter Lynn's position from borrowing what he needed in order to make good on his offer. This reality of financial life is, I think, "well-known by all reasonably intelligent people in the community," *Poulnot, supra,* 608 A.2d at 141 (citations omitted), and is therefore subject to judicial notice.

Under these circumstances, I cannot agree with my colleagues' conclusion that the judge's findings were clearly erroneous or that the judge abused his discretion. In my opinion, the judgment should be affirmed in all respects. Accordingly, I respectfully dissent.